E-FILED
Wednesday, 10 February, 2021  03:06:21 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| CENTRAL TOWER EXCHANGE CORPORATION, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:19-cv-01144 |
| v. | ) ) | |
| GERMAN MOTOR PARTS GmbH, a German corporation, and GERMAN MOTOR PARTS CZ s.r.o, a Czech corporation, | ) ) ) ) ) | |
| Defendants. | ) | |

# ORDER & OPINION

This matter is before the Court on the parties' cross-motions for summary judgment. (Docs. 25, 26). The motions have been fully briefed and the issues presented therein are ready for disposition. For the following reasons, the motions are each granted in part and denied in part.

## BACKGROUND[1]

Plaintiff, Central Tower Exchange Corp., is an Illinois corporation "engaged in promoting sales and soliciting orders for mechanical products manufactured and supplied by the companies it represents." (Doc. 16 at 1). Defendants are German Motor Parts GmbH, a private corporation located in Germany, and German Motor Parts CZ, a wholly owned subsidiary of German Motor Parts GmbH located in the Czech Republic. (Doc. 16 at 1–2).

---

[1] Unless otherwise noted, the facts in this section are undisputed.

Around May 24, 2013, Plaintiff and Defendant German Motor Parts GmbH entered into a sales agreement "whereby German Motor Parts GmbH appointed [Plaintiff] as its sales representative to attract business for German Motor Parts GmbH on a designated customer basis . . . ." (Doc. 16 at 3; *see also* doc. 3). In December 2015, Defendant German Motor Parts CZ was added to the agreement. (Doc. 16 at 3).

The relevant contract provisions are contained in Paragraphs 4, 8, and 13. (*See* doc. 3, ¶¶ 4, 8, 13). Paragraph 4 reads:

> The commissions are earned when the customer places orders with [German Motor Parts GmbH] and are due and payable on a monthly basis by the 25th of the succeeding month for all sales orders invoiced and paid in the prior period, regardless of when or where products or services are delivered.

Paragraph 8 states:

> In the event [German Motor Parts GmbH] would elect to terminate [Plaintiff] at any or all customers, [German Motor Parts GmbH] must give thirty (30) day written notice and pay commissions on all jobs currently in production or jobs realized as a result of quotations generated during the period of representation for the life of the part or program, no matter where or when shipped. Post termination commissions shall be paid on all engineering changes for the life of the part/program. All outstanding unprocessed requests for quotations in [German Motor Parts GmbH's] possession at the end of the thirty (30) day period will be returned to [Plaintiff].

Lastly, Paragraph 13 states:

> [German Motor Parts GmbH] agrees to pay reasonable attorney fees and costs in the event [Plaintiff] would have to retain legal counsel to enforce the Agreement.

2

As laid out in the contract, Plaintiff acted as Defendants' sales representative and solicited new business for Defendants. (Doc. 25 at 4–5). It appears Plaintiff was adequately compensated for its services at first, but Defendants began to fall behind on commission payments in early 2018. (Docs. 25 at 7, 26 at 2).

In July 2018, Plaintiff's Administrator emailed Defendants' General Manager (GM) about June commissions. (Doc. 28 at 22 (Ex. 1)). Included was a list of invoices due to Plaintiff in March and April 2018 and a reminder that those invoices were "way past due and need[ed] to be paid immediately." (*Id.* at 23–28). At that point, Defendants owed $25,610.58. (*Id.* at 22). Separately, the email noted the "Melrose Park Parts," a project for which the parties agreed Plaintiff would "hold off on billing . . . for a couple of months." (*Id.*). Plaintiff's Administrator stated it was "time to catch up on past shipments" and asked Defendants how they planned to accomplish this. (*Id.*).

In August 2018, Defendants' GM and Plaintiff's President exchanged emails addressing the outstanding payments.[2] (Doc. 26-1, Ex. A). Defendants' GM appears to have suggested holding off on paying invoices for a particularly troubled project. (*Id.*). Plaintiff's President replied Defendants' proposal was unacceptable and suggested a repayment plan Plaintiff could "live with" in order for Defendants to "get current on their commission" without having to resort to litigation. (*Id.*). This plan included Defendants paying the commission on all invoices as stated in the parties'

---

[2] Though Plaintiff does not appear to dispute the validity of this email exchange, the parties dispute the legal effect of this email exchange.

contract starting in September 2018 and paying an additional $5000 every month starting in October 2018 to pay down the arrearage. (*Id.*). Plaintiff's President stated the "only alternative that [Plaintiff] see[s] to [Defendants] making these payments (starting in September) is to turn this matter over to [Plaintiff's] attorneys . . . ." (*Id.*). Defendants' GM responded with his own proposal, which included sending new invoices by the end of September 2018 and starting payment of the additional $5000 per month in December of that year. (*Id.*). In response, Plaintiff's President requested a list of invoices Defendants planned to pay and asked if Defendants planned to add $5000 to monthly payments starting in December and continue those payments until all of Defendants' debt was paid. (*Id.*). Defendants' reply suggested they hold off on sending invoices until the end of September and confirmed its proposal for the additional payments. (*Id.*). It appears Plaintiff did not respond further. Following this exchange, Plaintiff began accepting payments toward the arrearage.

Problems with timeliness continued, however. On October 11, 2018, Plaintiff's Administrator again emailed Defendants' GM demanding September payments that were well past due and objecting to some invoices being put on hold despite Defendants' email stating they would start paying all invoices starting in September. (Doc. 28, Ex. 2). On November 26, 2018, Plaintiff's Administrator again emailed Defendants' GM asking about commissions that were due the previous day. (Doc. 28, Ex. 3).

In March 2019, Defendants attempted to renegotiate the terms of the contract in order to "reduce the commissions [Plaintiff] could earn and to avoid other

4

provisions of the Agreement, including Paragraph 8," but this attempt was rebuffed by Plaintiff. (Docs. 25 at 6, Ex. C; 27 at 3). On March 29, 2019, after these negotiations failed, Defendants sent a termination letter to Plaintiff, which was to take effect two days later on March 31, 2019 (docs. 25 at 6; 27 at 2), despite the fact the contract required thirty days' notice of termination (doc. 3, ¶ 8).

Plaintiff filed its Complaint in late April 2019, at which time Defendants owed $56,529.56 in outstanding commission payments. (Docs. 1, ¶ 42; 25 at 8; 27 at 2). Defendants continued to make payments throughout this litigation, eventually paying off the entire arrearage of $56,529.56. (Docs. 28 at 2, Ex. A; 30-1, Ex. A).

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmovant bears the burden of demonstrating that such genuine issue of material fact exists." *Aregood v. Givaudan Flavors Corp.*, 904 F.3d 475, 482 (7th Cir. 2018). "The parties must support their assertions that a fact is disputed or cannot be genuinely disputed by citing to admissible evidence in the record." *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018).

5

The record is viewed in the light most favorable to the nonmovant, and the Court must draw all reasonable inferences from the evidence in the nonmovant's favor. *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 900 F.3d 529, 536 (7th Cir. 2018). When presented with cross-motions for summary judgment, the Court must consider the motions separately, which necessarily means the nonmovant differs depending on the motion being considered. *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). This, however, does not alter the standard for reviewing a motion for summary judgment or the parties' respective burdens.

### DISCUSSION

The Complaint contains four claims. Count I alleges breach of contract; Count II alleges a violation of the Illinois Sales Representative Act (ISRA), 820 ILCS 120/1–3; Count III, pled in the alternative, alleges unjust enrichment; and Count IV requests declaratory relief affirming Plaintiff's contractual right to receive post-termination commissions and ordering Defendants to account for all commissions due to Plaintiff.[3] (*See* doc. 1).

Plaintiff seeks summary judgment on four points. First, combining the elements of Counts I and II, it requests the Court (1) determine Defendants breached

---

[3] The Declaratory Judgment Act permits a court to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). The request that the Court order Defendants "to account for all commissions due" to Plaintiff (doc. 1 at 13) is not a request for a declaration of rights; it is a request for injunctive relief. Plaintiff makes no argument injunctive relief is warranted here, thus waiving the request.

the parties' contract by failing to timely pay commissions and (2) award Plaintiff attorney's fees pursuant to both the contract and the ISRA. (Doc. 25 at 16). Second, drawing from Count II, it requests the Court find Defendants liable under the ISRA and award statutory exemplary damages in the amount of three times the unpaid commissions at the time the Complaint was filed. (*Id.*). Third, drawing from Count I and pursuant to 815 ILCS 205/2, it requests the Court award pre-judgment interest on the unpaid commissions during the period in which Defendants paid down their arrearage. (*Id.*). Finally, drawing from Count IV, it requests a declaration it is "entitled to post-termination sales commissions on any business solicited by Plaintiff" under the contract. (*Id.*).

Defendants likewise seek judgment on all four Counts of the Complaint. (Doc. 26). The Court will address each argument in turn. In doing so, the Court will apply Illinois law, as the parties agree is required by the contract at issue. (Docs. 3, ¶ 12; 16, ¶ 22).

## I. Breach of Contract

Both parties seek summary judgment on the breach-of-contract claim in Count I of the Complaint. As damages for this claim, Plaintiff requests prejudgment interest and attorney's fees and costs.

### A. Liability

In Illinois, a plaintiff suing for breach of contract must prove: (1) a valid contract existed, (2) the plaintiff performed as required by the contract, (3) the defendant breached the contract, and (4) damages. *Smart Oil, LLC v. DW Mazel, LLC*,

970 F.3d 856, 861 (7th Cir. 2020), *reh'g denied* (Sept. 4, 2020) (citing *Law Offices of Colleen M. McLaughlin v. First Star Fin. Corp.*, 2011 IL App (1st) 101849, ¶ 40, 963 N.E.2d 968, 981).

The parties agree a valid contract existed (docs. 25 at 3–7; 27 at 2), and the Court accepts their position. "A contract, to be valid, must contain offer, acceptance, and consideration; to be enforceable, the agreement must also be sufficiently definite so that its terms are reasonably certain and able to be determined." *DiLorenzo v. Valve & Primer Corp.*, 347 Ill. App. 3d 194, 199, 807 N.E.2d 673, 678 (2004). From the plain language of the contract, Plaintiff agreed to attract business for Defendants in return for commissions on resultant sales, which became due on the 25th day of the following month. (Doc. 3, ¶¶ 2–4).

Plaintiff further argues undisputed facts establish the remaining elements of its breach-of-contract claim. The parties agree Plaintiff performed compensable services under the contract. (Docs. 25 at 5–7; 27 at 2). And, importantly, the parties do not dispute Defendants repeatedly failed to timely pay commissions due to Plaintiff under the terms of the contract, resulting in an arrearage of $56,529.56 at the time the Complaint was filed. (Docs. 25 at 7–8; 27 at 2).[4]

Despite this *prima facie* showing of Plaintiff's breach-of-contract claim, Defendants contest Plaintiff's entitlement to relief, arguing (1) there was an agreed-

---

[4] The parties also agree Defendant terminated the contract without providing Plaintiff thirty days' written notice as required by the contract, also constituting breach. (Docs. 25 at 8; 27 at 3; 3, ¶ 8). However, Plaintiff does not explain how this particular breach resulted in damages.

upon modification to the contract reached in the August 2018 email exchange between Plaintiff's President and Defendants' GM (negating the element of breach) and (2) alternatively, Plaintiff waived its right to timely payments under the contract (an affirmative defense). (Docs. 26 at 4; 27 at 3).

### 1. Modification

"Under Illinois law, a valid modification of a contract must satisfy all the criteria essential for a valid original contract, including offer, acceptance, and consideration." *Urban Sites of Chicago, LLC v. Crown Castle USA*, 2012 IL App (1st) 111880, ¶ 35; *see also Doyle v. Holy Cross Hosp.*, 186 Ill. 2d 104, 112, 708 N.E.2d 1140, 1145 (1999).

Defendants' argument falls flat for want of consideration, which requires "some detriment to the offeror, some benefit to the offeree, or some bargained-for exchange between them." *Id.* "The preexisting duty rule provides that where a party does what it is already legally obligated to do, there is no consideration as there is no detriment." *Marque Medicos Fullerton, LLC v. Zurich Am. Ins. Co.*, 2017 IL App (1st) 160756, ¶ 65, 83 N.E.3d 1027, 1043 (internal quotation marks omitted). Thus, "[c]onsideration cannot flow from an act performed pursuant to a preexisting legal duty." *Id.* (internal quotation marks omitted).

The case of *Theodosakis v. Austin Bank of Chi.*, 93 Ill. App. 3d 634, 417 N.E.2d 806 (1981), is illustrative. There, the plaintiff executed a promissory note due to the defendant bank. *Id.* at 635. The note consisted of a principal due on demand at a later date plus interest, and the parties orally agreed the plaintiffs would begin making

monthly payments. *Id*. The plaintiffs subsequently struggled to make payments and requested the defendant modify the arrangement in order to ease their burden. *Id*. The parties agreed to an alternate payment plan, which was honored for around five years until the defendant sought more immediate payment. *Id*. at 635–36. In declining to find the alternate payment plan constituted a binding modification to the contract, the court noted the "agreement merely made an accommodation to plaintiffs after they indicated that the monthly installments were too burdensome." *Id*. at 638. Finding the arrangement lacked proper consideration, the court noted the bank "received no additional benefit" since the amount of money it would receive from the plaintiffs remained the same. *Id*. at 638–39.

Similarly, the August 2018 email exchange between the parties evinces no new consideration for the alleged modification.[5]  Rather, the conversation shows Plaintiff accommodated Defendants' financial struggles by allowing additional time to pay the commissions due under the contract. (*See* doc. 26-1, Ex. A). Plaintiff received nothing new in exchange for its accommodation; the amount it was owed remained the same. Thus, no binding modification was established.

2.    **Waiver**

Defendants alternatively invoke the affirmative defense of waiver, which acts as a confession to a breach of contract but seeks to avoid its legal consequences.

---

[5] It is worth noting clear acceptance of the new arrangement is also lacking as Plaintiff's correspondence ends with a request and a question. However, assuming *arguendo* the parties did reach a modified agreement, it was nevertheless unenforceable because it was unsupported by new consideration.

*Abellan v. Lavelo Prop. Mgmt, LLC*, 948 F.3d 820, 829–30 (7th Cir. 2020). Whether a waiver existed is a question of law when there are no disputed material facts and only one reasonable inference may be drawn from them; however, its existence becomes a question of fact if material details are disputed or if more than one reasonable inference may be drawn from the agreed upon facts. *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1140 (7th Cir. 2009).

"Waiver is the 'intentional relinquishment of a known right' and may occur either through an express statement or be implied through the conduct of the waiving party." *Norman v. U.S. Bank Nat'l Assoc. as Tr. for Structured Asset Mortg. Inv. II, Inc.*, 2020 IL App (1st) 190765, ¶ 23 (quoting *Ryder v. Bank of Hickory Hills*, 146 Ill. 2d 98, 104, 585 N.E.2d 46, 49 (1991)). "Where a specific time is fixed for performance of some act, but performance is not made at that time, and the parties perform the act after the time fixed, fair dealing compels the conclusion that the time provision is waived." 12A Ill. Law and Prac. Contracts § 279 (citing *Bhd. of Sleeping Car Porters v. Pullman Co.*, 200 F.2d 160, 164 (7th Cir. 1952)). Specifically, the "failure to make payments within the contract time may be waived by the receipt and acceptance of overdue payments." *Id.* (citing *Cottrell v. Gerson*, 371 Ill. 174, 180, 20 N.E.2d 74, 78 (1939) ("[T]he right to forfeit a contract is waived where the contract provides for prompt payment at fixed dates and payments are not so made, but have been made and accepted after they became due."). "Where the time fixed by the contract for performance is permitted to pass, both parties concurring, the time of performance thereafter becomes indefinite and one party cannot rescind until full notice and a

reasonable time for performance is given." *Id*. (citing *Allabastro v. Wheaton Nat. Bank*, 77 Ill. App. 3d 359, 365–66, 395 N.E.2d 1212, 1217 (1979)); *see also Barnes v. Nw. Repossession, LLC*, 210 F. Supp. 3d 954, 965 (N.D. Ill. 2016).

The following is a summary of the relevant facts to Defendants' waiver defense. As of July 2018, Defendants' failure to make timely commission payments resulted in an arrearage of $25,610.58 (doc. 28 at 22), which prompted the August 2018 email exchange in which the parties discussed a plan to pay down the arrearage in the form of $5000 monthly payments in addition to timely monthly payments under the contract going forward (doc. 26-1, Ex. A). Defendants were subsequently late on their monthly commission payments in (at least) September and November 2018 (Doc. 28 at Exs. 2, 3; *see also* doc. 25 at 32 (ex. C) ("[Defendants] failed to timely pay commissions due and owing to [Plaintiff] for the months of March–December 2018, and January–March 2019)), and by the time Plaintiff filed suit in April 2019, the arrearage had more than doubled to the amount of $56,529.56 (doc. 28 at 2). It is unclear how many late monthly commission payments were accepted by Plaintiff following the August 2018 email exchange (as opposed to the late commissions being added to the arrearage), but it is undisputed that Plaintiff continuously and promptly demanded payment of past-due commissions and accepted payments from Defendants, even during this litigation, until the entire arrearage was paid off (*see* docs. 28 at 2; 25 at 16).

There are perhaps sufficient facts to find Plaintiff waived its right to timely payment to some extent, particularly with respect to the initial arrearage of

$25,610.58; indeed, Plaintiff itself suggested it would accept payments toward the arrearage *in order to avoid litigation* and then in fact did so (doc. 26-1 at 6). *See Cottrell*, 371 Ill. at 180 (holding acceptance of late payments waived the right to timely payment). However, the effect of Plaintiff's assertions in the August 2018 email exchange and Plaintiff's conduct thereafter raise questions of fact. Plaintiff was well within its rights to reestablish strict compliance with the contract, *e.g.*, 12A Ill. Law and Prac. Contracts § 279, and Plaintiff's August 2018 demand for strict compliance with the contract moving forward coupled with the offer that Defendants incrementally pay off the existing arrearage, could reasonably be construed as such, particularly as Plaintiff repeatedly and promptly demanded timely payments when Defendants were late on their monthly commission payments. *See City of Chi. v. Chi. Title & Tr. Co.*, 205 Ill. App. 3d 728, 735, 563 N.E.2d 65, 70 (1990) (noting that a party accepting late payments may waive its right to timely payments *unless* it gives a definite and written notice of the intention to require strict compliance (citing *Allabastro*, 77 Ill. App. 3d at 395)). If Plaintiff successfully reestablished strict compliance with the contract, Defendants' waiver defense could apply only to the original arrearage, if it applies at all. On the other hand, Plaintiff's conduct in allowing the arrearage to more than double after the August 2018 email exchange and in continuously accepting payments toward the growing arrearage until it was paid in full could reasonably be construed as continued waiver of the right to timely payment under the contract despite its multiple demands for strict compliance therewith. *See Cottrell*, 371 Ill. at 180.

13

The parties' arguments focus too heavily on whether the August 2018 email exchange constituted an agreement, conflating the modification and waiver defenses. The proper focus is on Plaintiff's *conduct* and *assertions* in relation to Defendants' repeated failure to make timely payments both before and after the August 2018 email exchange. In the Court's view, more than one reasonable inference can be drawn from Plaintiff's conduct and assertions, rendering the issue of waiver a question of fact. *See Delta Consulting*, 554 F.3d at 1140 (whether waiver exists "becomes a question of fact if . . . more than one reasonable inference may be drawn from the agreed upon facts"); *In re Krueger*, 192 F.3d 733, 739 (7th Cir. 1999) ("Whether a Bank's continued acceptance of past due payments, without a demand for more prompt payment,[6] constitutes waiver of a contractual provision is a question of fact."). Consequently, summary judgment is inappropriate for the breach of contract claim in Count I. Fed. R. Civ. P. 56(a).

## II.  The ISRA

Both parties next seek summary judgment on Count II of the Complaint, which alleges a violation of the ISRA. In connection with Count II, Plaintiff seeks exemplary damages as well as attorney's fees and costs.

### A.  Liability

The ISRA provides:

All commissions due at the time of termination of a contract between a sales representative and principal shall be paid within 13 days of

---

[6] The Court recognizes Plaintiff did repeatedly demand timely payment, but its conduct was arguably contradictory and could allow a reasonable person to find Plaintiff waived its right to timely payments.

termination, and commissions that become due after termination shall be paid within 13 days of the date on which such commissions become due. Any provision in any contract between a sales representative and principal purporting to waive any of the provisions of this Act shall be void.

820 ILCS 120/2.

Defendants argue commissions only become "due" under the ISRA pursuant to the "terms of the contract," 820 ILCS 120/1(2)(A), and because the parties agreed to amend the payment terms, no commissions were actually due at the time of termination. (*See* doc. 26 at 5) ("Since [Defendant] had not violated the terms of the contract as amended and agreed to by [Plaintiff], it did not violate the ISRA as the parties agreed to the amended repayment schedule.").

The Court disagrees. As discussed above, there was no binding modification to the contract's payment provisions. Thus, at the time Defendant prematurely terminated the contract, its late commissions were still due under the terms of the agreement; indeed, they were well past due. This fact is not changed by Plaintiff's alleged waiver; indeed, even if Plaintiff waived its right to seek damages for untimely payments under the contact, the payments were nevertheless due. And to the extent Defendant suggests Plaintiff's alleged waiver also operated to waive its rights under the ISRA, the Court notes the plain language of the statute precludes this possibility. 820 ILCS 120/2 ("Any provision in any contract between a sales representative and principal purporting to waive any of the provisions of this Act shall be void."); the Court sees no reason why this provision would not apply to implied waivers as well as explicit waivers. In sum, there were outstanding commissions due that were not

paid within thirteen days after Defendants prematurely terminated the contract; this constitutes a violation of the ISRA.

> B.    *Damages*

The Court must diverge from Plaintiff, however, in its argument for mandatory exemplary damages. Under the ISRA, a principal that fails to comply with section 2 of the Act

> shall be liable in a civil action for exemplary damages in an amount which does not exceed 3 times the amount of the commissions owed to the sales representative. Additionally, such principal shall pay the sales representative's reasonable attorney's fees and costs.

820 ILCS 120/3. Citing this provision, Plaintiff asks the Court to grant it $169,588.68 in exemplary damages (three times the $56,529.56 arrearage stated in the Complaint) and attorney's fees and costs. (Doc. 25 at 16). According to Plaintiff, use of the word "shall" in the statute makes exemplary damages and costs mandatory once a defendant is found in violation of the Act. (Doc. 25 at 11–13). Plaintiff further contends Defendants' repeated late commission payments, multiple requests for extensions to answer the Complaint, and failures to respond to discovery until compelled to do so by the Court warrant the maximum damages allowed by the ISRA. (Doc. 25 at 13–14).

Plaintiff cites two cases holding exemplary damages are mandatory: *Midwest Enter., Inc. v. Generac Corp.*, No. 91-C-2229, 1993 WL 199046, at *7 (N.D. Ill. June 10, 1993), and *KRW Sales, Inc. v. Kristel Corp.*, No. 93-C-4377, 1994 WL 75522, at *2 (N.D. Ill. Mar. 8, 1994). However, in the same breath, Plaintiff cites other cases undercutting its own argument. (*See* doc. 30 at 10). In fact, the other cases Plaintiff

cites shows its interpretation to be outdated, replaced by Illinois and, subsequently, federal courts with a heightened standard for awarding exemplary damages under the ISRA. Plaintiff cites *B. Milborn & Associates. v. Trident Press International*, No. 03-C-50002, 2004 WL 2538292, at *2 (N.D. Ill. Nov. 8, 2004), in which, although exemplary damages were upheld, the court held "there must be evidence to support a finding of willful and wanton conduct" to impose exemplary damages under the ISRA. And while *English. Co. v. Northwest Envirocon, Inc.*, 278 Ill. App. 3d 406, 413, 663 N.E.2d 448, 453 (1996), also cited by Plaintiff, stated the ISRA must be "interpreted broadly," it relied on *Maher & Associates, Inc. v. Quality Cabinets*, 267 Ill. App. 3d 69, 640 N.E.2d 1000 (1994), for guidance, *see Eng. Co.*, 278 Ill. App. 3d at 411.[7] In *Maher,* the court stated:

> Punitive, or exemplary damages are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future. As such, punitive damages may be awarded only for conduct involving an element of outrage similar to that normally found in crime. The conduct must be outrageous, *i.e.*, defendant's acts are done with an evil motive or with reckless indifference to the rights of others.

267 Ill. App. 3d at 80 (internal citations and quotation marks omitted).

Sympathetic to the same argument Plaintiff advances here, another federal court noted use of the word "shall" would ordinarily demand mandatory exemplary damages; however, the court went on to state it must nonetheless respect the interpretation adopted by Illinois courts. *See Kelly v. McGraw-Hill Cos., Inc.*, 865 F.

---

[7] Notably, *Eng. Co.* also dealt with the meaning of the term "products" in the ISRA, not whether exemplary damages are mandatory or discretionary, *see* 278 Ill. App. 3d at 412; it therefore provides little guidance on the issue at bar.

Supp. 2d 912, 920 (N.D. Ill. 2012). Indeed, the Seventh Circuit adopted this interpretation in *Gramercy Mills, Inc. v. Wolens*, 63 F.3d 569, 573 (7th Cir. 1995) ("Illinois courts caution against awarding exemplary damages under the Sales Act except to punish and deter intentional or egregious conduct" (internal quotation omitted)), and numerous other courts have held the same since. *See Maher Eng'g Co. v. Screwmatics of S. Carolina, Inc.*, No. 03-C-50002, 2014 WL 4979167, at *2 (N.D. Ill. Oct. 6, 2014); *B. Milborn & Assocs. v. Trident Press Int'l*, No. 03-C-50002, 2004 WL 2538292, at *2 (N.D. Ill. Nov. 8, 2004); *Installco Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 784, 784 N.E.2d 312, 320 (2002). Although this Court has serious reservations about this interpretation of the statute, it will not depart from established Illinois precedent or binding Seventh Circuit precedent.

The question is therefore whether Defendants ought to be subject to exemplary damages under the standard adopted by the Illinois courts. The Court thinks not. Under Illinois law, "[t]he preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly one of law." *Parker v. Four Seasons Hotel, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *see also Kelly v. McGraw-Hill Cos., Inc.*, 865 F. Supp. 2d 912, 920, 920 n.6 (N.D. Ill. 2012) ("[The plaintiff] argues that a trial is necessary to determine whether [the defendant's] conduct rises (or more precisely falls) to the level of outrageousness [required by the ISRA]. Not so."). To justify exemplary damages, a court must find the sales representative willfully and wantonly refused to pay, sinking to a level that is truly egregious and beyond bad faith. *See Installco*, 336 Ill. App. 3d at 784. The record does not support such a finding.

To be sure, the record shows Defendants were repeatedly late to make payments and had accumulated a substantial arrearage by the time the Complaint was filed. Yet, the record also shows at least some of Defendants' issues came from troubled projects about which Plaintiff was aware and was willing to accommodate,[8] cash flow troubles (doc. 28, Ex.5), and a (wrongful) belief a binding contract modification existed (doc. 26-1, Ex. 1). Additionally, it is undisputed Defendants continued to make payments until the arrearage was entirely paid off. (Doc. 28 at 2). This evidence does not support a finding of sufficiently egregious conduct to impose exemplary damages under the ISRA.

C.    *Attorney's Fees and Costs*

Unlike with exemplary damages, Plaintiff need not show any culpability by Defendants to obtain reasonable attorney's fees and costs under the ISRA because "these damages are compensatory and not punitive and because the plain language of section 3 of the Sales Act provides that attorney fees and costs 'shall' be imposed for a violation of section 2 of the Sales Act." *Maher*, 267 Ill. App. 3d at 81. Indeed, beyond a determination of what is truly "reasonable," the law gives the Court no room for discretion in awarding these sums to the sales representative. And in many of the cases previously cited, exemplary damages were denied but attorney's fees and costs

---

[8] In the summer of 2018, Plaintiff's Administrator emailed Defendants regarding one project, stating: "We made an agreement to hold off on billing for shipments of the Melrose Park Parts for a couple months. It is now time to catch up on the past shipments of Melrose Park Parts as well." (Doc. 28, Ex. 1). Defendants also emailed Plaintiff's President about a "Navistar" project that was causing Defendants financial trouble. (Doc. 26-1, Ex. A).

were awarded. *E.g.*, *Installco*, 336 Ill. App. 3d at 787. Thus, the Court concludes Plaintiff is entitled to reasonable attorney's fees and costs through the date of this Order. To aid the Court in making the appropriate calculation, Plaintiff is ordered to file an accounting of attorney's fees and costs within 14 days of the submission of this Order; Defendants may respond within 14 days of Plaintiff's filing.

### III.   Unjust Enrichment

Count III of the Complaint requests the Court award Plaintiff compensation for its work under the theory of unjust enrichment. Plaintiff does not request summary judgment on Count III and notes it was only pled in the alternative in case the Court found no express contract governed the relationship between the parties. (Doc. 28 at 11–12). Defendants, however, request summary judgment in their favor, arguing a contract between the parties clearly exists and Plaintiff is thus precluded from obtaining relief under the theory of unjust enrichment.

"Claims for breach of contract and unjust enrichment are mutually exclusive: "[U]njust enrichment is based on an implied contract, so it does not apply when an actual contract governs the parties' relationship." *Blanchard & Assocs. v. Lupin Pharms., Inc.*, 900 F.3d 917, 921 (7th Cir. 2018) (internal quotation marks omitted and alteration in original). However, this difference is of no consequence at the pleading stage, as parties may put forth both theories in the alternative. *Id.* That said, "a plaintiff may not pursue a quasi-contractual claim where there is an enforceable, express contract between the parties." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003). Therefore, where an express contract

20

clearly exists, a claim for unjust enrichment, while entirely permissible at the pleading stage, may be dismissed at the summary judgment stage.

The Court agrees Count III for unjust enrichment must be dismissed at this point. As noted above, a valid contract existed between the two parties. Therefore, Plaintiff is precluded from obtaining a remedy using this theory, and the claim itself must be dismissed. *Keck Garrett & Assocs., Inc. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) ("Illinois law does not permit a party to recover on a theory of quasi-contract when an actual contract governs the parties' relations on that issue.").

## IV. Declaratory Judgment

In Count IV, Plaintiff asks the Court to grant declaratory relief, "declaring that [it] is entitled to continuing post-termination sales commissions on any business solicited by [it] for the life of the part or program in accordance with Paragraph 8 of the Agreement."[9] (Doc. 25 at 15–16).

In support, Plaintiff argues the plain language of Paragraph 8 of the contract entitles it to post-termination commissions for its efforts, and business it solicited is still generating profits for Defendants. (Doc. 25 at 15). Plaintiff then asks the Court to consider its point of view at the time the Complaint was filed. (Doc. 28 at 12–14). At that point, Defendants had negotiated to avoid provisions of Paragraph 8 (doc. 25

---

[9] To reiterate, Paragraph 8, in relevant part, entitles Plaintiff to post-termination commissions "on all jobs [in process at the time of termination] or jobs realized as a result of quotations generated during the period of representation for the life of the part or program, no matter where or when shipped." (Doc. 3, ¶ 8).

at 6, Ex. C), terminated the contract without giving the contractually required 30 days' notice (docs. 25 at 6; 27 at 3), and been late on numerous monthly payments (doc. 25 at 7–8; 27 at 2). Thus, the argument goes, Plaintiff had a real, concrete interest in having the Court declare its rights regarding Paragraph 8 of the contract. Plaintiff contends subsequent late payments have kept this interest ripe. (Docs. 28 at 12–15; 30 at 7).

Defendants, on the other hand, argue declaratory judgment is improper because "no substantial controversy between the parties exists." (Doc. 26 at 5). Although they have never expressly taken a position on the issue, Defendants point out they have nonetheless continued to make payments and Plaintiff has not identified any post-termination commissions that are currently outstanding. (Doc. 26 at 5–6). Defendants contend the only actual issue Plaintiff has cited since filing its Complaint has been the timeliness of some payments, but the declaration Plaintiff seeks "has nothing to do with the purported delay in making payments. [Plaintiff] is seeking a declaration that Defendants should continue to make payments [they have] already been paying." (Doc. 29 at 3). Thus, Defendants conclude, there are no concrete adverse legal interests warranting a judicial declaration. (Doc. 29 at 4).

The Court agrees. The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Cases of actual controversy within the Act are those

that are justiciable under Article III. *Amling v. Harrow Indus. LLC*, 943 F.3d 373, 377 (7th Cir. 2019) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). Such cases are ripe and justiciable when the facts demonstrate "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (citing *MedImmune, Inc.*, 549 U.S. at 127). In any case, whether to entertain actions under the Declaratory Judgment Act is at the complete discretion of the Court. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).

The bulk of Plaintiff's argument and Complaint concerns the timing of Defendants' payments, not its entitlement thereto. Of course, the language of the contract is clear enough: Defendants must pay commissions due to Plaintiff by the 25th day of every month. Plaintiff is welcome to file suit should Defendants breach that provision.

With regard to post-termination payments more generally, Paragraph 8 also speaks plainly, and Plaintiff may certainly file another complaint if it feels its rights under the provision have been violated. However, at the moment, there is simply no dispute between the parties over the fact Defendants owe Plaintiff post-termination commissions. Indeed, from the time this Complaint was filed, Defendants have and, as far as the Court is aware, continue to pay post-termination payments as they become due, albeit occasionally in a delayed fashion. Simply put, at this time, any threat of these payments being improperly halted is too remote for the Court to grant a declaratory judgment of rights.

Therefore, this Court will exercise its wide discretion under the Declaratory Judgment Act to refrain from making a broad declaration of rights before presented with a concrete and particularized dispute.

<h3 align="center">CONCLUSION</h3>

IT IS THERFORE ORDERED that Plaintiff's Motion for Summary Judgment (doc. 25) is GRANTED IN PART and DENIED IN PART; Plaintiff is entitled to judgment on Count II of the Complaint. Defendant's Motion for Summary Judgment (doc. 26) is likewise GRANTED IN PART and DENIED IN PART; Defendant is entitled to judgment on Count IV of the Complaint. Count III is dismissed. Plaintiff is hereby awarded attorney's fees and costs through the date of this Order for its claim under the ISRA in Count II, the amounts for which Plaintiff shall prove up in a subsequent filing consistent with the directives contained herein. Count I remains pending, the permissible damages for which are limited to prejudgment interest and attorney's fees and costs incurred after the date of this Order.

SO ORDERED.

Entered this this 10th day of February 2021.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge
